UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

Matthew Ryan,                                    Chapter 7

               Debtor.                       Case No.: 8-19-70203-las
-------------------------------------------------------------x
Nebraskaland, Inc.,

               Plaintiff,

          -against-                          Adv. Pro. No.: 8-19-08051-las

Matthew Ryan d/b/a PW146, LLC,

               Defendant.
-------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER
## GRANTING DEFENDANT'S MOTION TO DISMISS

Plaintiff Nebraskaland, Inc. ("Nebraskaland") commenced this adversary proceeding against Matthew Ryan ("Ryan"), the debtor in this chapter 7 case, asserting that a debt owed to it by Ryan in an amount not less than $1,386,757 must be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).[1] *See generally* Amended Complaint ("Am. Compl."). [Dkt. No. 21].[2] Ryan's alleged liability is predicated on the liability of PW146 LLC ("PW146") to Nebraskaland under a contract between it and PW146. Nebraskaland does not allege that Ryan personally guaranteed the liability of PW146 to Nebraskaland or that Ryan, the managing member of PW146, signed the contract between Nebraskaland and PW146 in his individual capacity. Rather, Nebraskaland argues that Ryan is personally liable to it

---

[1] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., will hereinafter be referred to as "§ (section number)".

[2] Unless otherwise stated, all docket references to the adversary proceeding are cited as "[Dkt. No. __]" and all docket references to the related bankruptcy case of Matthew Ryan, Case No. 8-19-70203-las, are cited as "[Bankr. Dkt. No. __]."

under an alter ego or piercing the corporate veil theory. Nebraskaland, therefore, asks this Court to disregard the corporate form, impose personal liability upon Ryan, and determine that the debt is nondischargeable.

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York, dated August 28, 1986, as amended by Order dated December 5, 2012.

Presently before the Court is Ryan's motion to dismiss the Amended Compliant in its entirety for failure to state a claim upon which relief may be granted pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), as made applicable to this adversary proceeding by Bankruptcy Rule 7012 and 7009. *See generally* Motion to Dismiss ("Motion to Dismiss").[3] [Dkt. No. 16]. Nebraskaland filed opposition to the Motion to Dismiss [Dkt. No. 31], and Ryan filed a reply [Dkt. No. 32].

The Court has carefully considered the arguments and submissions of the parties in connection with the Motion to Dismiss. For the following reasons, the Court grants Ryan's Motion to Dismiss the Amended Complaint.

I.    Background

A.    Factual Allegations[4]

Nebraskaland is a wholesale distributor of food, primarily boxed beef, poultry, pork, lamb, and seafood, based in the Hunts Point Meat Market, Bronx, New York. Am. Compl. ¶

---

[3] Ryan filed the Motion to Dismiss in response to the original complaint filed by Nebraskaland. [Dkt. No. 1]. Upon the filing by Nebraskaland of the Amended Complaint, Ryan decided to rely on his initially filed Motion to Dismiss rather than filing an answer or a new motion to dismiss. [Dkt. No. 25].

[4] The facts stated are taken from Nebraskaland's Amended Complaint, unless otherwise noted, and are accepted as true for the purposes of the Motion to Dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). References to the allegations in the Amended Complaint should not be construed as a finding of fact by the Court, and the Court makes no such findings.

18. PW146 is a Delaware limited liability company, formed on August 27, 2015, with a principal place of business at 72 North Village Avenue, Rockville Centre, New York. *Id*. ¶ 11. Ryan is the managing member of PW146 and lists PW146 as a d/b/a in his chapter 7 bankruptcy petition. *Id*. ¶ 13.[5]

Nebraskaland alleges that on or about September 15, 2017, Ryan met with Daniel Romanoff, Executive Vice President of Nebraskaland, Mark Bruscella, Director of Wholesale Sales for Nebraskaland, and Luis Ramieraz, Vice President of Sales for Nebraskaland, to discuss the prospect of PW146 providing futures trading services to Nebraskaland's beef trading division. *Id*. ¶ 37. At that meeting, the parties discussed Ryan's departure from Westside Foods, Inc. ("Westside"), Ryan's family business. *Id*. ¶ 38. Ryan advised that at the time of his departure, in an effort to ensure that Westside would not lose money on any remaining beef inventory, Ryan personally purchased the beef and sold the remaining beef to Quirch Foods, Co., another beef distributor. *Id*. Daniel Romanaff was deeply impressed by Ryan's commitment towards Westside in assuring that Westside would not lose money on the remaining inventory and justifiably relied upon Ryan's promise that he would act with the same level of commitment towards Nebraskaland. *Id*. ¶ 39. Nebraskaland reached out to a trusted contact, the President of Tyson Northeast, Greg Charuka, who had futures dealing

---

[5] Nebraskaland does not specify where in Ryan's chapter 7 petition, schedules and statement of financial affairs he lists PW146 as a d/b/a. Ryan does state that he is the 100% owner of PW146, *see* Schedule A/B ¶ 19, and lists a debt to Nebraskaland in the amount of $1,386,500, as disputed, and arising from a breach of contract action, *see* Schedule E/F, ¶ 4.4. Prior to the filing of his chapter 7 petition, on May 10, 2018, Nebraskaland commenced an action in the Supreme Court of the State of New York, County of Bronx (Index No. 25512/2018E), against Ryan and PW146 seeking damages for breach of contract, breach of implied covenant of good faith and fair dealing, fraud, fraudulent inducement, negligent misrepresentation, breach of fiduciary duty, promissory estoppel, and unjust enrichment. Am. Compl. ¶ 72. In response to Part 3, Question 12, of his chapter 7 petition which asks if he is a sole proprietor of any full or part-time business, Ryan answered no, *see* Petition, Part 3, Question 12. In response to Part 1, Question 4, of his chapter 7 petition which asks for any business name and employer identification number a debtor has used in the past eight years, Ryan listed PW146 and the employer identification number, *see* Petition, Part 1, Question 4.

with Ryan and who personally recommended Ryan to Nebraskaland. *Id.* ¶ 40. In addition, Richard Romanoff, Daniel Romanoff's father, called Thomas Ryan, Ryan's father and President of Westside, and Thomas Ryan strongly recommended Ryan's expertise in futures trading services. *Id.* ¶ 41.

Nebraskaland alleges that on or about September 26, 2017, Ryan, through PW146, entered into an Operating Agreement with Nebraskaland whereby PW146 would provide futures beef trading services to Nebraskaland's beef trading division. *Id.* ¶¶ 14, 19, 43. This was a new business venture for Nebraskaland and, prior to September 2017, Nebraskaland had not engaged in futures beef trading. *Id.* ¶ 19.

After Nebraskaland contracted with PW146, Daniel Romanoff learned that Ryan misrepresented the circumstances of his departure from Westside to deceive Nebraskaland and Nebraskaland relied upon Ryan's purported expertise when it entered into this new business transaction. *Id.* ¶ 46. Nebraskaland alleges that Westside was left with $28,000,000 of inventory and Quirch Foods, Co. sustained a significant loss of approximately $2,000,000. *Id.*

Although Nebraskaland and PW146 are the only parties to the Operating Agreement, Nebraskaland alleges that it has a claim against Ryan and that in his bankruptcy petition Ryan listed a debt owed to Nebraskaland in the amount of $1,366,500. *Id.* ¶ 9. In the 112-paragraph Amended Complaint, Nebraskaland's alter ego allegations are set forth in the following three paragraphs:

> 15.    Upon information and belief, Ryan and PW146 are either one in the same, partners, agents and/or principals and co-conspirators of each other; Ryan d/b/a PW146 performed the acts and conduct herein alleged, aided and abetted the performance thereof, or knowingly acquiesced in, ratified, and accepted the benefits of such acts and conduct, and therefore is liable as alleged herein.
>
> 16.    Upon information and belief, at all relevant times herein, PW146 was and is completely dominated and controlled by its Principle (sic) Managing

4

Member, Ryan, and that each was the alter ego of the other with respect to the transactions and conduct alleged herein. Through his control, Ryan abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against Nebraskaland such that this Court should intervene. The separate identities of each were so disregarded that PW146 primarily transacted Ryan's business rather than any of its own.

17.    Ryan's control of PW146 was used to breach contractual obligations and commit a fraud and/or wrongs against Nebraskaland which resulted in Nebraskaland's injury.

*Id*. ¶¶ 15–17.

The Amended Complaint refers to Ryan as "Ryan/PW146" when alleging what took place after Nebraskaland and PW146 entered into the Operating Agreement. Nebraskaland alleges that Ryan/PW146 was retained to use its expertise and existing client base to provide trading opportunities to Nebraskaland for commodities (beef and other meat products) at one price with the anticipated future placement of orders for the same commodities by third parties at higher prices. *Id*. ¶ 20. Nebraskaland alleges that from September 26, 2017 to February 5, 2018, it purchased significant amounts of the commodity of beef in reliance on Ryan/PW146's representations and promises that Ryan/PW146 had secured verbal or written purchase orders of the beef inventory at a profit for Nebraskaland and not at a loss. *Id*. ¶ 23.

Nebraskaland alleges that under the Operating Agreement, a party may terminate the Operating Agreement upon 90 days written notice to the other. *Id*. ¶ 24. Nebraskaland further alleges that Ryan/PW146 terminated the Operating Agreement on February 5, 2018 without giving the specified advance notice to Nebraskaland. *Id*. Nebraskaland asserts that although Ryan promised verbally to Nebraskaland on many occasions up to and including February 5, 2018 that he had procured buyers for and/or would assist Nebraskaland in procuring buyers for approximately $9,000,000 in unsold highly perishable beef inventory, all at profitable amounts, he has not done so to date. *Id*. ¶ 25. Nebraskaland asserts that it justifiably relied on Ryan/PW146's multiple promises to procure buyers to its detriment. *Id*.

¶ 26. During the period of January 1, 2018 to February 5, 2018, Ryan/PW146 additionally failed to answer phone calls and refused to respond to emails from Nebraskaland requesting updates on the status of buyers' orders for the approximately $5,000,000 worth of perishable beef inventory, as well as assistance in procuring buyers for approximately $4,000,000 committed vendor purchase orders of the perishable beef inventory. *Id*. ¶ 28.

Due to Ryan/PW146's misrepresentations of fact, Nebraskaland was forced to sell the $9,000,000 worth of beef inventory at a loss. *Id*. ¶ 29. Nebraskaland has procured buyers for $6,400,000 worth of beef inventory at a loss of $730,000. *Id*. Nebraskaland continues to seek buyers for the remaining $2,600,000 million worth of beef inventory with additional expected losses of $260,000-$300,000. Nebraskaland claims that as a direct result of Ryan/PW146's actions, Nebraskaland has sustained losses of at least $1,386,757.00, including costs and fees. *Id*. ¶ 29. Nebraskaland alleges that Ryan/PW146 knew, or should have known, based upon its experience in the industry and Nebraskaland's futures beef selling history from September 2017 to December 2017, that Nebraskaland was justifiably relying on Ryan/146's expertise because Nebraskaland did not have the industry wide contacts with wholesale customers to profitably sell the remaining perishable beef inventory within a time frame necessary to avoid losses on this highly perishable product. *Id*. ¶ 30. Nebraskaland alleges that Ryan/PW146's false representations were purposedly calculated to harm Nebraskaland. *Id*. ¶ 31.

Nebraskaland had paid to Ryan/PW146 the weekly draw amount of $5,000. *Id*. ¶ 49. In addition, in or around October 2017, at Ryan's request, and to demonstrate its trust in Ryan/PW146, Nebraskaland agreed to a lump sum advance to Ryan/PW146 of $20,000. *Id*. From September 2017 through December 2017, based on purchase orders and information provided by Ryan/PW146 related to those purchase orders, it appeared that Ryan/PW146 was

successfully providing beef commodities futures trading services to Nebraskaland. *Id.* ¶ 50. During the period of September 26, 2017 through in or about November 15, 2017, Mark Bruscella gave final approval before Ryan/PW146 committed to the purchase of beef from any vendor. *Id.* ¶ 51. Mr. Bruscella based his approval on the purchase orders provided by Ryan/PW146. *Id.* In mid-November 2017, Ryan requested approval from Nebraskaland to commit to purchases directly with vendors so that the process would move faster. *Id.* ¶ 52. Because Nebraskaland trusted and relied upon Ryan/PW146's expertise and ongoing relationships in the beef trading industry, and Ryan/PW146 had been successful in the preceding two months of providing services, Nebraskaland permitted Ryan/PW146 to commit directly to vendors on a limited basis. *Id.* ¶ 53.

In early January 2018, Nebraskaland calculated the net profits and determined that for the fourth quarter of 2017, Ryan/PW146 owed Nebraskaland the amount of $48,928.00 representing the advances paid to Ryan/PW146 by Nebraskaland in excess of any net profit for the period through December 31, 2017. *Id.* ¶ 54. Nebraskaland alleges that Ryan/PW146 deceptively took advantage of Nebraskaland's reliance by conjuring up fictious sales and falsely representing the sale prices on actual sales. *Id.* ¶ 55. Nebraskaland asserts that on or about January 2, 2018, Ryan/PW146 purchased 16 loads of beef and when questioned by Nebraskaland about the significant purchase, Ryan/PW146 claimed he already had 10 of the 16 loads sold at an increased price – yielding a profit to Nebraskaland on the 10 loads. *Id.* Ryan/PW146 represented to Nebraskaland that even if the remaining 6 loads were sold at a loss, Nebraskaland would still see a profit based on the 10 loads committed by the buyer. *Id.* After Ryan/PW146 breached the Operating Agreement on February 5, 2018, Nebraskaland learned that Ryan/PW146 did not have a buyer for the 10 loads, only a commitment for 4 loads resulting in a significant loss to Nebraskaland. *Id.*

Nebraskaland alleges that after Ryan/PW146's improper termination of the Operating Agreement, it learned that between September 26, 2017 and February 5, 2018, Ryan falsely represented that beef was sold at a specific price, when in fact, the beef was sold at a lower price or not sold at all. *Id.* ¶ 33. Nebraskaland alleges that Ryan/PW146 deceptively took advantage of Nebraskaland's trust by conjuring up fictitious sales and misrepresenting the sale prices on actual sales. *Id.* ¶ 80.

Nebraskaland alleges that Ryan/PW146 acted with intent to deceive Nebraskaland by fraudulently concealing and/or falsely representing material information, *Id.* ¶ 82, and that Nebraskaland justifiably relied on Ryan/PW146's representations, *Id.* ¶ 83. Nebraskaland further alleges that it has sustained and continues to sustain losses attributable to the acts and conduct of Ryan/PW146. *Id.* ¶¶ 33,79. Nebraskaland further alleges that Ryan/PW146 acted willfully, deliberately, recklessly, intentionally, and with a conscious disregard of Nebraskaland's rights. *Id.* ¶¶ 86, 107, 111.

Nebraskaland asserts that Ryan should be held personally liable to it and the debt owed must be excepted from discharge under §§ 523(a)(2), (a)(4) and (a)(6).[6] *Id.* ¶¶ 99, 108, 112.

B. Ryan's Motion to Dismiss

Ryan takes a different view of the transaction between Nebraskaland and PW146. He disclaims personal liability for any obligation that may be owing by PW146 to Nebraskaland under the Operating Agreement and has moved to dismiss the Amended Compliant in its entirety. *See generally* Motion to Dismiss [Dkt. No. 16].

---

[6] Section 523(a)(2) excepts from discharge debts obtained by fraud. 11 U.S.C. § 523(a)(2). Section 523(a)(4) excepts from discharge debts obtained by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

To begin with, Ryan states in a footnote in the Motion to Dismiss that Nebraskaland impermissibly conflates Ryan with PW146 referring to the debtor as "Matthew Ryan d/b/a PW146, LLC" in the caption and "Ryan/PW146" throughout the Amended Complaint. *Id.* at n.1. Ryan asserts that while he is a member of PW146, the Amended Complaint fails to adequately plead that he is personally liable for any obligations of PW146 to Nebraskaland under an alter ego or piercing the corporate veil theory. *Id.* Ryan contends that the "conflation is erroneous and, so as to avoid causing the Court further confusion, [Ryan] does not adopt it" in his Motion to Dismiss. *Id.*

In moving to dismiss the Amended Complaint, Ryan argues that Nebraskaland only has a breach of contract claim against PW146 and is trying to recast its claim as one sounding in fraud to impose personal liability upon Ryan and prevent the claim from being discharged in his bankruptcy case. In addition, Ryan contends that even if Nebraskaland's claims were not recast as contract claims, the Amended Complaint should still be dismissed because it fails to allege specific facts pertaining to the alleged misrepresentations made by Ryan, thus failing to meet the heightened pleading standard under Fed. R. Civ. P. 9(b) which requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As such, Ryan argues that Nebraskaland's claim under § 523(a)(2)(A) alleging fraud must be dismissed. In addition, Ryan argues that Nebraskaland has failed to allege the existence of an express or technical trust required for a breach of fiduciary duty claim under § 523(a)(4). Lastly, Ryan argues that Nebraskaland has failed to sufficiently allege that Ryan engaged in willful and malicious conduct as is required to state a claim under § 523(a)(6).

II.    Discussion

A.    Fed. R. Civ. 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a

9

complaint under Rule 12(b)(6) for "failure to state a claim upon which the relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6) a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. To meet this standard, a plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant acted unlawfully." *Id*. The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (internal citation and quotation marks omitted). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Applying this plausibility standard is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 312 (S.D.N.Y. 2011) (quoting *Iqbal*, 556 U.S. at 679). Although all well-pleaded factual allegations in the complaint are assumed true for purposes of a motion to dismiss, see *Koch*, 699 F.3d at 145, this principle is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111 (citations omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). For a court to consider a document external to the complaint as "incorporated by reference," there must be a "clear, definite and substantial reference" to the document in the complaint. *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003). "A mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011). Conversely, "[m]ultiple references to, and lengthy quotations from, an outside document have been considered sufficiently substantial to incorporate the document into the complaint by reference." *Allen v. Chanel Inc.*, No. 12 CV 6758(RPP), 2013 WL 2413068, at *5 (S.D.N.Y. June 4, 2013). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "For a document to be considered integral to the complaint, the plaintiff must 'rel[y] on the terms and effect of a document in drafting the complaint . . . mere notice or possession is not enough.'" *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quoting *Chambers*, 282 F.3d at 153). "And 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document,' and it must be clear

that 'there exist no material disputed issues of fact regarding the relevance of the document.'" *Id.* (quoting *DiFolco*, 622 F.3d at 111).

"If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond,* 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (quoting *Poindexter v. EMI Record Grp.,* No. 11 Civ. 559 (LTS) (JLC), 2012 U.S. Dist. LEXIS 42174, at *6 (S.D.N.Y. Mar. 27, 2012)) (internal quotation marks omitted).

A court may also take judicial notice of matters of public record, including documents filed in other court proceedings, when considering a motion to dismiss. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991). However, courts may only take judicial notice of documents from other court proceedings "to establish the fact of such litigation and related filings" and "not for the truth of the matters asserted in the other litigation." *Id.* at 774.

B.      Fed. R. Civ. P. 9(b)

Nebraskaland's claim under § 523(a)(2)(A) is grounded in fraud. As such, in addition to pleading facts sufficient to meet the requirements of Rule 12(b)(6), Nebraskaland must meet the specificity requirement of Rule 9(b) by stating the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b) ("[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud."). Under this heightened pleading standard, a complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Grp.*, 47 F.3d 47, 51 (2d Cir. 1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). While the second part of Rule 9(b) provides that "[m]alice, intent, knowledge, and other

conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must "plead the factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal citation and quotation marks omitted). A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *accord ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

C.      Fed. R. Civ. P. 19(a)

Although not addressed by either party in their submissions, the Court must, as an initial matter, determine whether PW146 is a necessary party to this adversary proceeding as it is a signatory to the Operating Agreement at issue. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 861 (2008) ("A court with proper jurisdiction may" consider and raise the issue of nonjoinder *sua sponte*, even if it is not raised by the parties to the action.).

Fed. R. Civ. P. 19, made applicable to this adversary proceeding by Bankruptcy Rule 7019, governs the joinder of parties in a federal proceeding and provides a two-step inquiry to determine whether an absent entity must be joined. *Pryor v. Collins (In re Collins)*, Case No.: 8-15-70892-ast, Adv. Proc. No.: 8-17-08027-ast, 2018 WL 878877, at *6 (Bankr. E.D.N.Y. Jan. 8, 2018). The Court must determine whether "(1) the absent party is required; and (2) if so, whether joinder is feasible." *Id.* (citing Fed. R. Civ. P. 19(a)).

Fed. R. Civ. P. 19(a)(1) provides:

> (1) *Required Party*. A person who is subject to service of process
>     and whose joinder will not deprive the court of subject-
>     matter jurisdiction must be joined as a party if:
>     (A) in that person's absence, the court cannot accord
>         complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> i. as a practical matter impair or impede the person's ability to protect the interest; or
>
> ii. leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

Relief under an alter ego or piercing the corporate veil theory is "equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed." *Morris v. New York State Dept. of Tax'n & Fin.*, 623 N.E.2d 1157, 1160 (1993). Under New York law, "claims for the imposition of liability against a defendant that rest upon allegations that such defendant is liable to the plaintiff because it is an alter ego of another entity who has not been joined as a defendant, renders the non-joined entity a necessary party." *Intelligent Prod. Sols., Inc. v. Morstan Gen. Agency, Inc.*, 5 N.Y.S.3d 328, at *2 (Sup. Ct. 2014); *see also Mannucci v. Missionary Sisters of the Sacred Heart of Jesus*, 941 N.Y.S.2d 493, 494 (1st Dep't 2012) (holding a nonparty to be a necessary party under New York law where claims against the defendant were based solely on the theory that defendant is the alter ego of nonparty); *Morris*, 623 N.E.2d at 1162 (finding there can be no piercing of the corporate veil where there is no corporate obligation to be imposed). "Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners." *Morris*, 623 N.E.2d at 1160; *see also Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL 1234042, at *15 (S.D.N.Y. Mar. 31, 2017) (holding "to the extent that Plaintiff is asking the Court to impose corporate obligation on individual officers and directors, it must also join the corporation.").

Parties to a contract, whose contract is central to the dispute, are necessary parties. *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 707–08 (S.D.N.Y. 1997) (holding that a direct party to a contract under dispute renders the party a necessary party to the litigation). The corporate entity which is a signatory to the agreement at issue is a necessary party even if the entity is defunct, *Giuliano*, 2017 WL 1234042, at *15, or a shell corporation, *Miramax Film Corp. v. Abraham*, No. 01 CV 5202(GBD), 2003 WL 22832384, at *9 (S.D.N.Y. Nov. 25, 2003) (noting that "shell companies are necessary parties in an action to pierce the corporate veil.").

To the extent the corporate entities are parties to an agreement that underlies a plaintiff's breach of contract or fraud claims, adjudication of the dispute in the absence of the corporate entities might impair the ability of the entities to protect their interests. *Kawahara Enters., Inc. v. Mitsubishi Elec. Corp.*, No. 96 CIV. 9631 (MBM), 1997 WL 589011, at *3 (S.D.N.Y. Sept. 22, 1997). Because the court will be required to determine the non-party corporate entity's rights and obligations under the agreement, fairness would encourage the entity be given an opportunity to defend and protect its interest as a party. *Gunvor SA v. Kayablian*, 948 F.3d 214, 221 (4th Cir. 2020) (finding the corporate signatory to contracts with plaintiff to be a necessary party under Rule 19 where plaintiff sought damages from the individual officers for the signatory's failure to perform under those contracts.).

Here, Nebraskaland's claims against Ryan arose from alleged misrepresentations and misconduct in connection with the Operating Agreement between Nebraskaland and PW146. PW146, as a separate legal entity, exists independently of its owner. Ryan is not a party to the Operating Agreement and Ryan would not generally be liable for debts and obligations of PW146. *Giuliano*, 2017 WL 1234042, at *15. Yet, throughout the Amended Complaint, Nebraskaland references Ryan and PW146 interchangeably and alleges that "Ryan/PW146"

made various misrepresentations, breached their fiduciary duty to Nebraskaland, committed various fraudulent acts willfully, deliberately, recklessly, intentionally, with malice, and in conscious disregard of Nebraskaland's rights. Because PW146 and Nebraskaland are parties to the Operating Agreement, and not Ryan in his individual capacity, the Court must first determine the rights and obligations of the contracting parties before considering whether to pierce the corporate veil and hold Ryan personally liable. PW146 is a necessary party under Fed. R. Civ. P. 19(a) and must be joined to "accord complete relief to the existing parties," and be given an opportunity to defend and protect its interests.[7] The fact that Nebraskaland brought this adversary proceeding solely against Ryan to except a debt allegedly owed to it from discharge does not preclude the Court from determining the threshold issue of PW146's liability, if any, to Nebraskaland under the Operating Agreement. Upon that determination, the Court may, if necessary, address whether Ryan may be held personally liable for PW146's obligation under an alter ego or piercing the corporate veil theory. If so, the Court may then consider whether the debt must be excepted from discharge.

The absence of a necessary party will not result in dismissal of a complaint if joinder of the absent party is feasible. Indeed, as noted above, a court must *sua sponte* order a necessary party joined. *Collins*, 2018 WL 878877, at *6; *Baldwin v. Interscope Records, Inc.*, 19-cv-8923 (JGK), 2021 WL 847976, at *3 (S.D.N.Y. Mar. 4, 2021). Here, joinder of PW146 is feasible. However, before the Court orders the joinder of PW146 to this adversary proceeding, the Court finds it appropriate to address whether the Amended Complaint includes factually substantiated

---

[7] Ryan and PW146 moved to dismiss the state court action brought by Nebraskaland against them prior to the commencement of Ryan's chapter 7 case. Am. Compl. ¶¶ 73,74. The motions to dismiss were pending at the time Ryan filed his chapter 7 petition. *Id*. ¶ 76. The state court action was stayed upon the filing by Ryan of his chapter 7 petition. 11 U.S.C. § 362(a).

16

allegations that, if proven true, would establish that Ryan is personally liable under an alter ego or piercing the corporate veil theory.[8]

   D.   Alter Ego and Piercing the Corporate Veil Theories

   To pierce the corporate veil under New York law and hold another entity or individual liable on a claim against a corporation, a plaintiff must show that:

> (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and
> (2) such domination was used to commit a fraud or wrong against the plaintiff, which resulted in plaintiff's injury.

*Morris*, 623 N.E.2d at 1160; *see also Network Enters., Inc. v. APBA Offshore Prods., Inc.,* 264 F. App'x 36, 40 (2d Cir, 2008); *USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp. 3d 244, 266 (E.D.N.Y. 2014); *Ng v. Adler (In re Adler)*, 518 B.R. 228, 233 (E.D.N.Y. 2014); *Cortlandt St. Recovery Corp. v. Bonderman,* 96 N.E.3d 191, 203 (2018). The party seeking to pierce a corporate veil bears the burden of establishing there is a valid basis to do so. *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 261 (S.D.N.Y. 2014) (citing *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (1998)). "At the pleading stage, 'a plaintiff must do more than merely allege that [defendant] engaged in improper acts or acted in "bad faith" while representing the corporation,'" *Cortlandt*, 96 N.E.3d at 203 (quoting *East Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 944 N.E.2d 1135, 1136 (2011)). "[P]laintiff must allege facts that, if proved, indicate that the shareholder exercised complete domination and control over the corporation and 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice.'" *East Hampton Union Free Sch. Dist.*, 944 N.E.2d at 1136

---

[8] Under New York law, "alter ego" and "veil piercing" theories "are indistinguishable, do not lead to different results, and should be treated as interchangeable". *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *see also MWH Int'l, Inc. v. Inversora Murten, S.A.*, No. 11-cv-2444-GHW, 2015 WL 728097, at *11 (S.D.N.Y. Feb. 11, 2015) (stating that Second Circuit interprets New York's alter ego and veil piercing theories as "identical").

(quoting *Morris*, 623 N.E.2d at 1161). "It is sufficient at the pleading stage that the alleged facts and the inferences drawn from them establish the basic elements of the doctrine of piercing the corporate veil." *Cortlandt St. Recovery Corp.*, 96 N.E.3d at 205 (finding allegations support a cause of action for piercing the corporate veil where "the individual defendants adopted the corporate scheme, created the corporate shells to further the scheme, [and] misused the corporate form to commit a fraud.").

      1.  First Prong of Veil-Piercing

In determining whether an owner exercised complete domination over the corporate entity under the first prong of veil-piercing, courts consider whether any of the factors set forth in *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) ("*Passalacqua*") exist:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like,
> (2) inadequate capitalization,
> (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes,
> (4) overlap in ownership, officers, directors, and personnel,
> (5) common office space, address and telephone numbers of corporate entities,
> (6) the amount of business discretion displayed by the allegedly dominated corporation,
> (7) whether the related corporations deal with the dominated corporation at arms length,
> (8) whether the corporations are treated as independent profit centers,
> (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and
> (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id*. Courts need not weigh every factor, as they may not all be present in every case. *See New York State Elec. & Gas Corp. v. FirstEnergy Corp*., 766 F.3d 212, 225 (2d Cir. 2014) (holding veil piercing was warranted based on an analysis of some, but not all, of the *Passalacqua* factors).

Additionally, "[t]here is no set rule as to how many . . . factors must be present in order to pierce the corporate veil." *Adler*, 518 B.R. at 233 (internal quotation omitted).

Conclusory allegations of dominion and control, however, are not sufficient. *Goldman v. Chapman*, 844 N.Y.S.2d 126, 127 (2d Dep't 2007). More is required. "[W]hile it is generally not sufficient, at the pleading stage, to make conclusory allegations of control, setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of a motion to dismiss." *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 799 (S.D.N.Y. 2017) (quotations omitted); *see Strojmaterialintorg v. Russian Am. Com. Corp.*, 815 F. Supp. 103, 105 (E.D.N.Y. 1993).

Even where an individual defendant is the sole or equitable owner of the corporate entity in question, courts must still analyze the *Passalacqua* factors to determine whether the defendant exercised the requisite control over the corporate entity. *Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir. 1997); *see also Gateway I Grp. v. Park Ave. Physicians, P.C.*, 877 N.Y.S.2d 95, 100 (2d Dep't 2009) (finding complaint survived motion to dismiss where plaintiff landlord alleged the defendants shared a common address and telephone number, utilized the same equipment, paid each other's debt, had an overlap of owners, officers, and directors, and conveyed assets so that the tenant would be judgment proof); *East Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 884 N.Y.S.2d 94, 127 (2d Dep't 2009) (affirming dismissal of the complaint which only alleged the defendant was the sole officer, director and shareholder of the corporation but contained no allegations that defendant failed to respect the legal existence of the corporation, failed to respect corporate formalities, undercapitalized the corporation, or abused the privilege of doing business in the corporate form).

Here, as is stated above, allegations that Ryan and PW146 are one and the same, that Ryan dominated and controlled PW146, and that Ryan's control was used to commit a fraud or wrong that injured Nebraskaland are set forth in the following three paragraphs of the 112-paragraph Amended Complaint:

> 15.     Upon information and belief, Ryan and PW146 are either one in the same, partners, agents and/or principals and co-conspirators of each other; Ryan d/b/a PW146 performed the acts and conduct herein alleged, aided and abetted the performance thereof, or knowingly acquiesced in, ratified, and accepted the benefits of such acts and conduct, and therefore is liable as alleged herein.

> 16.     Upon information and belief, at all relevant times herein, PW146 was and is completely dominated and controlled by its Principle (sic) Managing Member, Ryan, and that each was the alter ego of the other with respect to the transactions and conduct alleged herein. Through his control, Ryan abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against Nebraskaland such that this Court should intervene. The separate identities of each were so disregarded that PW146 primarily transacted Ryan's business rather than any of its own.

> 17.     Ryan's control of PW146 was used to breach contractual obligations and commit a fraud and/or wrongs against Nebraskaland which resulted in Nebraskaland's injury.

Am. Compl. ¶¶ 15–17.

The allegations in paragraphs 16 and 17 regarding Ryan's domination and control of PW146 are pled "upon information and belief." A plaintiff may plead facts alleged "upon information and belief," but it is not without limitation. "The Second Circuit has recognized that '[t]he Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged "upon information and belief" where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible.'" *Warren v. ResMed Corp.*, 2022 U.S. Dist. LEXIS 114447, at *2 (S.D.N.Y. June 28, 2022) (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). "A plaintiff cannot, however, 'merely plop "upon information and belief" in front of a conclusory allegation and thereby render it non-

conclusory.'" *Id.* (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018)). "Factual allegations made on information and belief must 'be accompanied by a statement of the facts upon which the belief is founded.'" *Id.* (quoting *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 461 (S.D.N.Y. 2016), *aff'd*, 759 F. Appx. 42 (2d Cir. 2019)). Here, as discussed below, the Amended Complaint falls short.

It is undisputed that Ryan is the managing member of PW146, and in his chapter 7 petition Ryan disclosed that he owns 100% of PW146. Those facts alone are not sufficient to support the otherwise conclusory statements in paragraphs 15 through 17 of the Amended Complaint that Ryan exercised complete dominion and control over PW146 with respect to the transaction at issue. The question is whether the Amended Complaint sufficiently alleges the *Passalacqua* factors to survive a motion to dismiss on an alter ego or veil piercing theory. In other words, when considering the *Passalacqua* factors, has Nebraskaland pled sufficient facts regarding domination and control for its claim that Ryan is personally liable on an alter ego or veil piercing theory? Analysis of the relevant factors follow.

In considering the *Passalacqua* factors, the focus here is on factors one, two, and three as factors four through ten are more suited to an analysis of control when there are affiliated corporate entities. An analysis of *Passalacqua* factors one, two, and three demonstrates significant gaps in Nebraskaland's pleading on the issue of whether the Amended Complaint sufficiently alleges complete domination and control by Ryan of PW146 to survive a motion to dismiss on an alter ego or piercing the corporate veil theory.

The first *Passalacqua* factor examines whether the formalities of a corporate existence were disregarded. The Amended Complaint does not provide specific factual allegations to support a claim that Ryan disregarded corporate formalities and there is no mention of the absence of items that are part and parcel of corporate existence, such as issuance of stock and

maintenance of corporate records. Rather, the Amended Complaint contains conclusory statements that Ryan and PW146 "each was the alter ego of the other with respect to the transactions and conduct alleged," that Ryan "abused the privilege of doing business in the corporate form," that the "separate identities of each were so disregarded that PW146 primarily transacted Ryan's business rather than any of its own," Am. Compl. ¶ 16, without alleging specific facts or circumstances as to how Ryan disregarded the corporate form in conducting PW146's business. In short, Nebraskaland's analysis is insufficient to support its otherwise conclusory statement that Ryan disregarded the separate corporate identity of PW 146 when conducting business with Nebraskaland. Consideration of the first *Passalacqua* factor weighs in favor of Ryan.

The second and third factors examine whether the corporate entity was adequately capitalized and whether corporate funds were put in and taken out of the corporation for personal rather than corporate purposes. Absent from the Amended Complaint are any factually substantiated allegations that PW146 was undercapitalized or that Ryan used corporate funds for his own personal use or commingled personal and corporate assets. These factors likewise weigh in favor of Ryan.

In sum, the Amended Complaint does not sufficiently allege the relevant *Passalacqua* factors. As discussed above, notably absent from the Amended Complaint are any factually substantiated allegations that Ryan operates PW146 as an alter ego by (i) failing to observe corporate organizational formalities, (ii) transferring funds in and out of his personal bank account and PW146's corporate bank account, (iii) using PW146's corporate funds for his own personal use, and (iv) failing to adequately capitalize PW146. Thus, Nebraskaland has not pled sufficient allegations to support its alter ego or veil piercing theory. There must be "some examples of alleged domination" to support an alter ego or veil piercing theory to survive a motion to dismiss. *City of Almaty*, 278 F. Supp. 3d at 799 (internal citation and quotation

marks omitted). The Amended Complaint does not include sufficient allegations to support its otherwise conclusory statement that Ryan must be held personally liable which would "nudge its claims across the line from conceivable to plausible." *Trujillo v. City of New York*, 696 F. App'x 560, 561 (2d Cir. 2017) (quoting *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014)). These claims are precisely the type of "parrot[ed] factors enumerated in the veil-piercing case law" that must be dismissed as conclusory. *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 87 (S.D.N.Y. 2010). While Nebraskaland argues in its opposition that the issue of alter-ego liability is an inherently factual determination and that a motion to dismiss must not be granted prior to discovery, courts "routinely consider, and grant, motions to dismiss for failure [to] adequately . . . allege facts sufficient to support the imputation of liability on an alleged alter-ego." *Id.* at 86. The Amended Complaint has failed to adequately plead facts to support that Ryan completely dominated and controlled PW146 with respect to the transaction at issue as required under the first prong of veil piercing. *Morris*, 623 N.E.2d at 1160–61.

### 2.    Second Prong of Veil Piercing

The second prong requires that a party seeking to pierce the corporate veil must show that such domination was used to commit a fraud or wrong that resulted in injury to the party seeking to pierce the corporate veil. *Morris*, 623 N.E.2d at 1160. A party seeking to pierce the corporate veil must, therefore, sufficiently allege both prongs. "It is incumbent upon [p]laintiff[] to plead sufficient facts to support both prongs of the veil-piercing inquiry – that is, both disregard for the corporate form and resulting fraud or injustice." *Spagnola*, 264 F.R.D. at 87; *Goldman*, 844 N.Y.S.2d at 127. Because the Court has determined that beyond conclusory allegations of domination the Amended Complaint does not contain sufficiently

supported allegations that, if proven true, would establish that Ryan and PW146 are alter egos, the Court need not address the second prong of the veil piercing theory.

## III. Leave to Amend

In sum, because the Amended Complaint fails to join PW146 as a necessary party and fails to include factually substantiated allegations that, if proven true, would establish in the first instance that Ryan and PW146 are alter egos, the Court need not address whether the Amended Complaint contains sufficiently supported allegations to support a claim that (i) Ryan's alleged domination of PW146 in the transaction under attack was used to commit a fraud or wrong that injured Nebraskaland, or (ii) the alleged debt owed Nebraskaland must be held nondischargeable pursuant to §§ 523(a)(2), (4) and (6). Although Nebraskaland, in opposing the Motion to Dismiss, did not seek leave to amend should the Court determine that the Amended Complaint fails to state a claim upon which relief may be granted, Fed. R. Civ. P. 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." Because of this "permissive standard," *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), the Court will permit Nebraskaland to file a motion for leave to amend, so long as it has a good faith basis to do so, by no later than October 28, 2022.

## IV. Conclusion

For the reasons set forth above, Ryan's motion to dismiss the Amended Complaint is granted without prejudice. If Nebraskaland seeks to amend its Amended Complaint and

has a good faith basis to do so, it must file a motion for leave to amend no later than

October 28, 2022.



Dated: September 27, 2022
     Central Islip, New York

**Louis A. Scarcella**
**United States Bankruptcy Judge**